Good morning, gentlemen. Thank you very much for agreeing to participate in these arguments in this unusual forum. As I pointed out to the people in the previous case, this panel just conducted two sessions of in-person oral argument in Houston. And as far as we can tell, those sessions both went off quite well with appropriate safety precautions. So if and when you have another opportunity to argue in the Fifth Circuit, God willing, this Zoom period will be over. But if not, some panels will allow you to avail yourself of in-person argument. Let me add just a couple of precautions about this situation. We ask you to mute any cell phones or devices that you have. We also have the same rule that you may not record visually or from an audio standpoint any of these proceedings just as if we were in New Orleans. We have read your briefs and record excerpts. We have not necessarily gotten into the entire record, so we appreciate record citations when those are appropriate. With that, we call case number 20-50067, Newberry v. City of Windcrest, TX. And we'll hear first from Mr. Braun. Hey, please, the Court. Your Honors, my name is Alan Braun, and I represent the appellant Brandy Newberry in this matter. There are two major issues that I wanted to discuss with the Court during my time today. The first is that the District Court abused its discretion when it applied an improper standard to its analysis of Ms. Newberry's sex discrimination and retaliation claims. And second, that when the correct standard is applied, the evidence demonstrates that Ms. Newberry's claim should have survived summary judgment. Regarding the first issue, this is discussed in the reply brief, but the trial court largely based its decision that Ms. Newberry's sex discrimination claims failed and that her conduct was not sexual in nature. In other words, that she was not subject to sexual discrimination because the conduct was not sufficiently sexual in the mind of the trial court. Counsel, do you have a traditional Title VII claim, or do you have a hostile work environment claim, or are you trying to allege both? It's both, Your Honor. She has both a gender discrimination claim and a hostile work environment based on sex harassment claims. How can you have a hostile work environment claim with only two incidences of yelling? So can you help on that, please? Yes, Your Honor, because it's beyond just two incidents of yelling. What's in the record? Not only do you have those instances, Your Honor, but following that, as the briefing describes, Ms. Newberry alleged that she was followed by another officer, that when she brought complaints about that officer, that that officer was then made her partner, and that she was not given proper support by other officers, that as a result of bringing these complaints and as a result of being a woman, that she was treated less favorably. That's the basis of the claim. Counsel, are you saying that it's severe or that it's pervasive, or what are you saying? And what case would say that these types of incidents would qualify as severe or pervasive? Well, Judge, we're arguing that it's pervasive because of the fact that really from the time that Ms. Newberry started, that she was subjected to this treatment, and that really goes to the standard set out by the court in Gostock versus Clayton County, Georgia, that when someone is treated differently because of their sex, that that brings a rise to a sex discrimination claim under Title VII. Who's your comparator? The main comparator is the other officer who was involved with the final incident at the Home Depot that Ms. Newberry, that formed the basis, one of the basis of Chief Ballard's decision to terminate Ms. Newberry. And that is because that officer was a male, that officer was involved in the same situation, yet despite that, Chief Ballard only reprimanded that officer and did not move to terminate him as he did with Ms. Newberry. But I thought Ms. Newberry quit before she could be fired. What the record demonstrates, Judge, and you'll see that the Chief testified in his deposition, and that's in the record at pages 2911 through 2912, that he did, in fact, make a decision to terminate her. What happened was, and this is in his affidavit, that paragraph 31, and that is in the record at 3009, is he got a recommendation for termination and agreed to uphold it. However, Ms. Newberry had not yet been informed of that when she was when she resigned. So a decision to terminate was made by the defendant, and in reviewing the Chief's affidavit and in reviewing the facts, the defendant largely ignored its own policies and improperly used evidence of excused absences, a citizen complaint that was found to be baseless. They alleged that Ms. Newberry had a pattern of not accepting criticism, and Chief Ballew discussed that in his deposition in the record at 2886 through 87. Mr. Braun, let's cycle back to what you said at the beginning of your argument, which was that the federal district court misapplied the law by failing to see, infer that this was because of her sex. And I didn't, offhand, speaking as one member of the panel, I did not see a misunderstanding of the law. He said this female officer yelled at her, but and then there's why did she interpret it? Is it because she's a woman that anybody who yells at a woman must be practicing sex discrimination? I mean, how do we draw that connection? Yes, Judge, and that's really what the Bostock standard looks at, is it's not, well, is someone yelling at a woman, but is somebody yelling at the person because they're a woman? Are they being mistreated because of their sex? Does that mean that no white male has ever going to have a Title VII claim because presumptively, if you're yelling at a white male, you are, you are, Bostock doesn't protect that? No, Judge, I wouldn't agree with that statement. What I would say is, is that you have to look at the motive behind the activity. And the problem is, is that what the district court did was it said this conduct has to be sexual in nature. But what the standard is, is is the treatment, the negative treatment only occurring because of the person's sex, that if the person was a different sex, that it wouldn't have been occurring. And that's what Newberry brought complaints about. And that's what was supported during the investigation by Officer Hernandez, where the independent investigator brought in by Wynn Press said, yes, this officer treats women differently. And that was in the report that the city produced on the record at 2970. What what the district court was really looking for were comments of a sexual nature or something that expresses sexual desire. But that's not the correct standard. Well, but even if that's true, assuming, Arguendo, that that you're correct and that you don't need sexual desire, that kind of sex in order to state this, why isn't Ellis Farragher a complete defense here, given that they did have an investigation and took action, so they can't be vicariously liable? Well, Judge, because their reasons for termination demonstrate a great deal of pretext. The main piece of evidence. They didn't terminate. So that's not we need to go back. We have to take each claim separately. We're dealing with the hostile work environment. If they had to prompt remedial measures and had an investigation and found that it wasn't substantiated and this person only supervised her for one, actually, I think one short time period, one day or so, you know, then then they can't be liable. And we're only dealing, first of all, with the hostile work environment. We'll come back to constructive discharge, which requires something to be so outrageous that any reasonable person would have to walk off the job, which is a really high standard. So let's first of all, talk about hostile work environment and why the Ellis Farragher defense does not completely bar your claim. Judge, because they did not follow the recommendations in their own corrective report. If you look at the chief's deposition in the record at twenty nine, twenty four through twenty five, they and at twenty eight or six and the other citations in the record, essentially both Lieutenant Lee and the chief were pointing the finger at each other as far as who was responsible for implementing the report and the corrective report. And so, yes, they have this policy and they have this report that's issued, but they're not acting on it. They didn't discipline Officer Jamie as a result. They determined that there was a personality clash instead of sexual harassment and then she no longer supervised her. Isn't that correct? Yes, judge. However, in addition, in the report, another officer, Officer Hernandez, said, look, this officer treats women differently than men. And one male in particular, there was evidence that the officers thought that she was more likely to help him than other officers. And so when questioned about that, the chief simply said that, well, that was his opinion. So they picked and chose the findings in this report that they were going to apply. That's why Farragher doesn't apply in this matter. OK, well, how can you have a constructive discharge on these facts where the conditions are not so intolerable that any I mean, what case would say that these conditions are tolerable? Usually that's an extreme in our circuit. The case law is very strict on this, that the type of pressure you have to be on to be constructively discharged. Well, the first thing that I would say is the fact that they were moving to terminate her at that time demonstrates that she was right. She didn't know that, so she can't be relying on that. Yes, judge, I still think it's an important background fact, though, and what you see in the facts in this case is that every time that Officer Newberry went to her superiors for help, things only got worse. She goes and makes the complaints about the discrimination. They tell her, don't do that. It's going to be make everything worse. She goes and complains about being followed by Officer Gorelli and he's made her partner. So what it's showing to her is nothing is going to get better here and they're not actually going to do anything to affect the team. Utility is not the same thing as oppression for the purposes of constructive discharge. Saying that, oh, this is a really bad situation, it's not going to get better, doesn't and so therefore I'm going to quit, is not the same thing as an intolerable working condition such that you must leave immediately. Judge, in the situation with Officer Gorelli, for example, she was bringing concerns that she was physically afraid for her life, that she was told that this officer was following her and was recording her and her family. And she goes and reports this and tries to raise this concern. And instead of helping her or separating them, they make him her partner. Was that was that ongoing at the time that she walked off the job? Yes, Judge, that was shortly before she resigned. So what is your best case that that's that's satisfactory for constructive discharge under our circuit law? If you don't have that, I have one where you can, I guess, on rebuttal on your regular Title seven, what if it's that one supervisor who only supervised her for one day, you have to have a tangible employment act. You have to have the power to have a tangible employment action to take a tangible employment action. And I don't think that that supervisor had that power under this record. Did they? Such for your regular Title seven case, I don't see how you can establish your regular Title seven. Judge, that supervisor's decision was used as the basis in and this is expressed in Chief Ballin's affidavit deposition when they're saying, well, we're going to terminate her because she has this history of not accepting constructive criticism. And when asked and confronted with numerous documents showing that Miss supervisor's claim was the only one that was used. But what tangible employment action took place? She was not terminated. So what tangible employment action took place that is the basis for the Title seven claim? Well, Judge, that she was I do believe that she was terminated or she was constructively discharged. I was going to say constructive discharge would be an adverse employment consequence. Right. But he said he had a freestanding Title seven claim. And so I that's unless it's constructive discharge, you don't have a freestanding Title seven claim, correct? Yes, Judge, but we are arguing constructive discharge. Right. But we've talked about that at length. OK, all right. Your time is up. You have time for rebuttal, however, will you from Mr. Henry? Yes, your honor. May it please the court and counsel. Brandy Newberry resigned. She pled that she resigned. She testified she resigned. She stipulated she resigned. She resigned in her resignation letter. She says that she resigned because she had careful thought and consideration. She talked to her family. She talked to her lawyer before she submitted her resignation. This is not a termination case. The issue for this matter is, was she constructively discharged? Oh, I'll let you run. Excuse me. No, that's fine, Judge. Was she constructively discharged because of her gender? Or was she constructively discharged because she filed the complaint against Simon? Were conditions so bad that they affected a term or condition of her creating an environment essentially of oppression that negatively affected a term or condition of her employment? She is not listed where a term or condition was negatively affected because of Officer Jaime. And that's kind of you go through the chronology, there really isn't anything that rises to the level. Of that, the aspects with regard to the her title seven and slash labor code chapter 21 claims are really twofold. One, she doesn't have an adverse employment action that has occurred to her. And two, there's really nothing but. Her own subjective conjecture of a causal link. And so what about the fear for her life with her partner? Point that was made. Yes, Your Honor. Well, that has that goes with the shift change aspect. And if we jump to that. Right before it in October. She says that Officer Torres told her Officer Gurley was following her, but by her own admission, she has no other information that that was occurring. Officer Torres dispute she ever said that and has since the beginning. But the issue is not that necessarily there's a dispute between the two of them. The issue is there's nothing else in the record that shows, um, it was actually happening. And, but when she brought it to the attention of Lieutenant Lee, he talked to everybody, he talked to Gurley, he talked to Torres, he talked to Newberry and said, okay, it's a misunderstanding. That's not actually what happened. There's nothing to indicate that that is because of gender or because of the Jaime complaint. And when you jump to the transfer to being on the same shift, it's undisputed that the city is very small. Um, in size it's got, uh, only two to five officers per shift. So they're not partners. They're just in the same state. I was going to ask you, because I grew up in San Antonio and Windcrest is not a big subdivision. No, Your Honor. It's not. Um, they don't, are they out there patrolling in a cart in tandem? I mean, you'll, you'll have basically three cars, three officers, uh, up to five, but, but normally it's, it's just three and they're all in different parts of the city. They don't talk to their own cars. They're in their own cars. Yes, Your Honor. Yeah. So saying it's not accurate to say he had been, she'd been forced to work with him as a partner. No, Your Honor. They're just on the same shift. They're, uh, the shift change, um, was based on seniority and being a probationary officer, Newberry was at the bottom. Um, and they transferred her, um, kind of based on that he was on the same shift, but not in the same car. And perhaps involved weekend. Um, I'd have to double check the, the, the B shift, Your Honor. I don't believe so. I think it was, it was just kind of when it, when it fell, but both the A shift and the B shift would have about the same number of weekend days versus regular days as to kind of when it would, would overlap, but when asked why she thought they transferred her to the same shift as Grelly, she said it's because she reported Grelly. Well, reporting Grelly is not a protected activity. She didn't say it was because she reported Jaime. She didn't say it was because of gender. She didn't say it was because of anything like that. She said it was because she reported Grelly. As a result, being put on the same shift, one doesn't, is not an adverse employment action that affects a term or condition of employment. Um, but two isn't based on, um, anything that's protected under title seven. What reasons, uh, did, uh, the city or city officials provide or why they were planning to, uh, to terminate, uh, Ms. Newberry? Yes, Your Honor. The, the termination sequence for a probationary officer, they always review all probationary officers at the end of the first year. And so her, the end of her first year was in February, February, 2017. And so they always collect their evidence and they talk about, uh, and just, I don't want to make it sound like it's semantics, but there's a difference between non-renewal and termination. Um, it's not a for-cause aspect. It's just, okay, you could have still done everything right and not violate policy, but if you're not going to fit here because of budgets or transfers or whatever other reason, they just, they won't renew it, but they, they that the Lieutenant had said he, he used as the basis of his recommendation. So he came to Chief Ballew, um, on, I believe it was the 25th or 26th. Um, and said, I don't think we need to renew her. Um, and they listed several things. Um, one being when that looking back on it, they realized she had kind of abused the, the, uh, leave policy. Um, they also, um, there was the December, um, Home Depot incident where, um, both officers involved, uh, didn't properly recognize, uh, an individual that had a mental handicapped. Um, they didn't really handle it correctly. Both were, were disciplined. Um, Chief Ballew testified that, uh, what the, the question asked him during his deposition wasn't, did you terminate Newberry? It was, did you ever consider doing that? And he said, well, yeah, I did. Because when you're looking at the whole first year, you're looking at everything and termination is one of the options that's available as a non-renewal. The other officer, while he didn't do it correctly, he didn't require anxiety, calm down afterwards. Um, Newberry, um, I believe the chief refers to just kind of freaked out and, and, um, became, um, she needed to, to be not exactly sedated, but calm down afterwards and called EMS, um, or had EMS check her out at the time. And the other officer did not actually require that kind of attention afterwards. And there wasn't a physical injury or anything. It was just her, her anxiety or emotional response to the situation. So the chief testified that to him, that was a very big indicator as to why he may be inclined to go with the recommendation that she be terminated. However, um, he did testify, uh, and he's, he, he's been testifying since the beginning. If you look back at the, um, the record, um, at nine 25, which is the affidavit that she blew signed in the EEOC phase prior to the litigation being filed, he very clearly said, I normally will draft different alternatives of things that can happen, but I don't make the decision until after I talk with the officer. So, um, he actually had drafted, um, a, uh, a termination letter. And there are two drafts in the record. If you look at, um, 1446 through 1447, which was attached to the Lee's, uh, deposition is a draft that is a little different than the one, um, that was brought forth in the chief's deposition. They listed out the various different reasons why, um, a non-renewal really was, was appropriate. The draft from Lee, um, was drafted on the 26th. Lee was in the process of putting together his written recommendation. Uh, the chief very clearly said he hadn't made his decision, but if he would be inclined to do that, he wanted things prepared. His, the, the letter that was attached to the chief's deposition was actually dated, uh, January 30th, which is three days after Newberry's resignation. And on the top, it actually said notes that she resigned. So, um, he kind of finished it off after she had resigned, but he hadn't made the determination prior to her resignation. Um, you, um, unless judge Smith had a follow up there, uh, other, the other council, Mr. Braun says that, uh, Bostock, uh, sets forth some kind of new test for this, frankly, garden varieties, sex discrimination claim. What's your, and obviously the district court was not aware of Bostock when he wrote the decision. A, do you think the district judge used the wrong standard? And B, in any event, pre-Bostock, post-Bostock, what is your position? Yes, judge. I don't believe he used the wrong standard. He actually, um, stated several times. Well, first he's, he said that nothing rose to the level of violating a term or condition of her employment or being so egregious that, um, someone would feel compelled to resign. And in the paragraphs, he said that he basically said, assuming that all of her testimony and her version of events is true, so if you assume all that's true and you still don't have an adverse employment action, that is a basis for granting the summary judgment right there. Um, he then said there was no indication of, um, sexual desire, which kind of comes under the, the Alamo, the Texas Supreme court, Alamo Heights, um, uh, case, but there are other factors to it. He then said, there's nothing of a sexual nature for any of this. So there's nothing that really ties it other than conclusory statements. But under Bostock, Bostock itself said, and I'll get the exact quote, so I don't misquote it. Um, title seven does not concern itself with everything that happens because of sex. Um, the statute imposes liability on employers only when they fail or refuse to hire or discharge or otherwise discriminate against someone because of a statutory deprecating characteristic like sex, when you read that, uh, in conjunction with the Oncology case, they basically said title seven doesn't come into play for actual, uh, distinctions between a male and female, uh, or, or sex or gender-based aspects that are innocuous, um, or the regular routine things that happen in every office, every employment situation. Um, and I know this, this court has heard it a thousand times, but title seven is not a general civility code. Right. And that's really all that is being raised is petty slights, rudeness. Um, all of, if you look at all of the assertions made by, uh, Ms. Newberry, they're single events. They're not things that continued. So Oncology and Bostock together basically say title seven is only concerned with the big stuff that affects a term or condition of your employment, that's the stuff that they can't use sex as a factor in. And that's the stuff sex has no business being a factor in. And none of that's really here, but, uh, as just, just fully, um, noted during the parts of the analysis, even if you assume that gender was the motivating factor, none of it rises to the level of constituting a hostile work environment, affecting a term or condition of employment, let alone causing being so intolerable, that extra element you got to have for the constructive discharge being so intolerable that a reasonable person would feel they got to resign. That is not what this case is. Did that answer your question? I think so. Um, why did the, well, I agree with that. No, it's, uh, fine. But if, uh, these were only single events of mistreatment, why did the city go to the trouble of hiring an expert and having a report produced, which I'm sure cost the Wincrest taxpayers thousands of dollars? Yes, Your Honor. The, as Judge, as Chief Ballew testified, um, technically Newberry, um, didn't initially, uh, filed the complaint in the FTO, uh, evaluations is where she listed all of her complaints against officer Jaime and they noted because they've been trained to note, look, just because someone doesn't go through the formal process and fill out the form that you want them to, that doesn't mean you can ignore something that should set off bells and whistles that there might be a problem. And so they actually looked at, uh, the evaluation, the FTO evaluation and said that, you know, that's a problem. And so they asked her, uh, field training officer. Oh, right. I that's right. That was all over the place. Okay. Um, so each, um, probationary officer gets to evaluate all of all their FTOs at the end of the process. And so that, that was the form that Ms. Newberry filled out and that's what set off the bells and whistles, uh, for the city and they say, okay, well, this is the allegation she alleged that it was, um, discrimination or hostility because of gender. So, um, let's bring in, uh, someone from the outside and they'll tell us if we need to make corrections, we'll make corrections. If we don't, then we won't. And what the report actually came back and said is it is not gender based. It's a personality conflict. Um, the only issue that, um, uh, Enid McBride noted probably didn't need was that it was confirmed officer, uh, Jaime was rude to Newberry over the radio and she needed some, uh, uh, a little extra discussion or training on how to not be rude over the radio. But, um, that wasn't limited to females. That wasn't limited, um, to, to Newberry. That was, she needs to do that, you know, cause she was doing it to everybody. What about the officer who said that she is harder on women? Yes, Your Honor. What he said was he had never seen any inappropriate, um, uh, gender based conduct, uh, but he does think that she would have helped officer her, or sorry, Sergeant Hernandez. There's there are two Hernandez's. So I'll make sure I'm referencing the right one. Uh, Sergeant Hernandez, who was the one that, that there was a rumor that there was some sort of a relationship between Jaime and Hernandez, but no one ever saw it, it was just that no one ever saw them, um, engaging in improper activity amongst themselves. But his opinion, his impression was he would probably help officer or Sergeant Hernandez, uh, before he would help others, including officer Newberry. Um, he said that officer Newberry, um, he asked, uh, Amy McBride, what, why is it that, um, Jaime can be, you know, rude to women and ignore them, but I don't necessarily see that with men. Um, but there was no specifics, but then he said she ignores me and she won't shake my hand. What does rude mean? I mean, what, what, what was the rudeness over the radio? I remember the ignoring and not making eye rolling her eyes and so on, but what was rudeness on the radio? You know, your honor, I don't think the record actually says what the rudeness was, um, when I looked through it, it was just noted that she was rude when she, um, made requests over the radio, but I don't, I don't think the record actually says what she said that was rude. And so, um, and I think, uh, Ms. McBride noted that, you know, several people, including officer, uh, Jaime kind of conceded she, she was blunt about whatever it was that was said, but I don't think the actual words were ever, they aren't in the record. At least not that I could find. Okay. Counsel, I'm not sure it matters what was in the termination letter, but I do have a, uh, since, since it wasn't issued, but I do, I'm curious as to why it was appropriate to discuss the citizens complaint when it was unfounded and why, I guess maybe because of the reaction or something that you talked about earlier, and then also why would sick days be discussed if six days are not used in the normal protocol? What were they using factors that are not used for others? And so does that raise some suspicion? Okay. Yes, your honor. The, when you're looking at the end of probation period, what chief blue testified to is he's looking for the right fit, which means you can still get, you can, you can technically comply with everything, but if you're going to be one that officers don't trust, because if you're assigned to work Christmas and everyone's going to expect, you're not gonna, you're going to call on sick for Christmas every single time, even if like individual ones are approved, that's not revealed until you look back on it for the whole year. And that kind of aspect goes to the, I guess, the personality, uh, of the individual officer. And so that you can't use those for probationary period to permanent, you can use that type of thing, even if you don't normally use it in evaluating permanent employees year to year. Yes, that's exactly right. You're on. Yeah. And it's the same with the, uh, the interactions with the public and the technically, uh, it wasn't technically a violation. The way she handled it was something that they thought was either concern or that, um, she would need some additional training on to kind of, uh, polish up. I believe I'm out of time unless the panel has any other questions. Thank you. Thank you. Okay. Mr. Brown rebuttal. Unmute yourself. Can y'all hear me? Yes. Now we can. Okay. Thank you. Just a couple of brief points. The first is that when I'm discussing Bostock, Bostock is really an extension of on-call a, uh, which is really where they set out the standard that a title seven claim exists when the treatment complained about is because of the protected category. And that's really what I'm arguing. That's the position that is. But we have, we were real familiar with that on-call and we had a whole en banc on that in Oboe brothers. But the problem here is, do you have any substantiation that it was because of sex and, or that it was severe or pervasive, you know, that's the problem with this case, isn't it? Well, the argument is that Ms. Newberry was treated the way that she was because she was a woman and that was corroborated by officer Hernandez in that report, which is in the record at 2970, that, uh, officer Hyman did not treat women the same way that she treated men and how many women are there in this department? I believe there weren't very many, uh, judge. I think there were only two or three at that time from what I can recall. I may as one of them, the plaintiff is the second one. So there might've been one other female officer. That's what I recall, judge. Uh, and so what happened next was the chief, when they got this complaint from Ms. Newberry, they said that they thought it was an EEO complaint. They recognized it as a sex discrimination complaint. And the chief talked about that in his depot at 2852 and sent a letter to her that they were going to investigate the discrimination complaint and that was at 2996. So at that point, she had not even, she hadn't filed anything EEOC herself. Correct. Okay. And so, uh, following that, uh, they have this investigation by McBride and they did not like the fact that Newberry brought this complaint, that's the didn't bring a complaint. She evaluated Jaime. Is that what happened? Well, but she also participated in this investigation. Well, I understand that, but I mean, technically speaking, she, she, uh, complain, her only complaint was in an evaluation of Jaime. It was not at that point, a, a title seven. She would have admitted, I think that at that point it hadn't risen to title seven. I would disagree with that judge. I think that following up on that, she provided them with information saying, look, I'm being treated differently, uh, because I'm a woman. Uh, and that was, she brought that up in the record at, uh, 2576. Um, she provided them information saying, look, officer Jaime is treating me they recognized it as that. And then they turn around. And when I'm asking the chief, uh, what he was looking at when he was evaluating Rutherford Terminator, he said that he considered this complaint that was brought, he testified to that, and that was at. I apologize. That was in the record at, uh, 2912. So he directly stated that the fact that she brought this complaint that he acknowledged as a discrimination complaint was what made him look at her as being not a team player and therefore not appropriate for continuing employment with the city. And that's why in this, in this letter that they drafted up where they're discussing, uh, well, what are the reasons we're going to terminate her? They had excused medical absences. They had the citizen complaint that was unfounded. They had a claim that she had a pattern of not accepting criticism that was based on the one incident with Jamie. It's all pretext. They didn't. Officer Jaime, is officer Jaime the one who criticized her for home depot or for when she drew her weapon instead of her taser in a, in a home security check, what it, what precisely precipitated the first incident with officer Jaime? It was an incident where they had a call and officer Jaime had complaints about a report that Ms. Newberry had prepared. That's right. And the grammar, right? Yes, your honor. Okay. There was just about the grammar and they argued about the grammar, quotation marks. Yes, your honor. And then there was an incident where they were pulled into the judge's chambers and that's when Ms. Newberry says, look, officer Jaime was yelling at me and that's where it went forward from. Pulled into the judge's chambers. Remind me about that. That, that's, that's a room at the Windcrest PD and it's described more thoroughly in the briefing, but it's a room where there are no security cameras. Oh, but there's not a judge there. No, correct. Oh, I see that. It's there for the use of the judge, but it's, there's no judge there. Right. Okay. If there's nothing further, I'll yield since I'm out of time. Okay. Uh, thank you very much. We appreciate both your arguments and we'll look at the record closely and the court will take recess for 10 minutes.